# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
CASE NO. 15-mc-00023-GLS-CFH

JOHN DOE,

Plaintiff,

v.

EJERCITO DE LIBERACION NACIONAL,
a/k/a ELN, a/k/a National Liberation Army,
and FUERZAS ARMADAS
REVOLUCIONARIOS DE COLOMBIA,
a/k/a FARC, a/k/a REVOLUTIONARY
ARMED FORCES OF COLOMBIA,

Defendants.
_____/

## AFFIDAVIT OF DAVID L. GADDIS

I, David L. Gaddis, declare and state as follows:

1. My name is David L. Gaddis, I am over the age of 18 years, and I have personal knowledge of the facts set forth herein.

2. I joined federal Drug Enforcement Administration (DEA) in February 1986, where I was assigned to the Atlanta Field Division in Atlanta, Georgia. My subsequent assignments included the DEA Miami Field Division; the DEA's Office of International Operations drug interdiction program, known as Operation SNOWCAP, with extended TDY assignments in South and Central America and San Jose, Costa Rica, where I worked as a Criminal Investigator in Costa Rica and Nicaragua, focusing on Colombian drug trafficking organizations. In 1995, I was promoted and assigned to the Hermosillo, Mexico, Resident Office

where I served as the Resident Agent in Charge. In 1998, I was assigned to DEA Headquarters in Washington, D.C., serving as Staff Coordinator and Section Chief in the Mexico and Central America Section, Office of International Operations. In 2000 I assumed the position of Deputy Chief of International Operations. In 2001, I was reassigned as Assistant Special Agent in Charge for the North Carolina District, where I managed DEA operations throughout the State until assignment to the Senior Executive Service as Regional Director for DEA's Andean Region in Colombia, Venezuela, Ecuador and Peru. As the DEA Regional Director in Colombia, I supervised enforcement operations for high-value targets of the Revolutionary Armed Forces of Colombia ("FARC") and drug trafficking cartels. I headed the management and enforcement operations of this region until 2006 when I was promoted from Bogotá, Colombia, to Mexico City, Mexico, as DEA's Regional Director for Canada, Mexico, and Central America.

3. In 2009, I was selected as Deputy Chief of Operations, Office of Global Operations, Chief of Enforcement Division, and reassigned to DEA Headquarters in Arlington, Virginia. In this capacity, I supervised, managed and coordinated enforcement and administrative matters for all of DEA's field elements -- domestic and foreign -- and represented DEA's offices worldwide on matters relating to joint investigations and enforcement initiatives and other programs within the inter-agency community. As the DEA Chief of Global Enforcement, I regularly coordinated with the U.S. Department of Justice's Office of International Affairs, the Asset Forfeiture & Money Laundering Section, and numerous U.S. Attorney offices. I retired from the DEA on March 31

4. Through my extensive career in law enforcement concentrating on narcotics trafficking, I learned of the Colombian drug cartels, their modus operandi, and how their illicit enterprises affected socio-political conditions in Colombia.

5.   The Colombian drug trade focuses on supplying illicit drugs to consumption populations in the United States, Europe and Australia. This drug trade requires extensive logistics coordination, both for the movement of product, and for reintegration of funds, which is achieved through money laundering networks.

6.   In my experience I have observed that the various drug cartels and the FARC coordinate their efforts to meet their distribution demands. I have also observed a number of Colombian drug cartels, including the FARC and the Ejercito de Liberacion Nacional ("ELN"), who generated "front" companies and nominee accounts to hide their illicit enterprises. The FARC and the ELN supply the raw materials for cocaine to the narco-trafficking organizations.

7.   The FARC effectively controls the worldwide supply of cocaine. It is estimated that 80% percent of the world's cocaine is produced in Colombia or in the neighboring border regions immediately adjacent to Colombia with the aid and assistance of the FARC. The FARC is the world's leading cocaine manufacturer and trafficker.

8.   The FARC runs an extensive criminal enterprise throughout Colombia, South and Central America. It has deep ties to nearly all major drug cartels, including the Mexican drug cartels. The FARC's cocaine distribution, terrorist and money laundering operations extend to Africa, the Mideast, Europe and Asia.

9.   The FARC has been implicated in numerous acts of terrorism. The FARC is a foreign terrorist organization designated under Title 8, United States Code, Section 1189, originally designated on October 8, 1997.

10.   Due to its own activities and its ties to both narcotrafficking and terrorist organizations, the U.S. Government designates the FARC as both a drug trafficking organization and an international terrorist entity.

11. The FARC, as the world's premier narco-terrorist organization, the world's largest cocaine producer, and wholesale distributor, is intricately linked with Hezbollah, a leading terrorist group.

12. Their ideological outlooks complement each other. They display the same anti-Americanism. The FARC is a central player in the anti-American movement in the Americas, Hezbollah, allied with and supported by Iran, plays a central Anti-American role in the Middle East. They are more than just trade partners, but are comrades in arms. Hezbollah and FARC work together in their global narcotrafficking and terrorism efforts.

13. In furtherance of their common goals, the FARC works closely with Hezbollah in a massive conspiracy to export cocaine and launder drug money.

14. Since the early 2000's, the FARC and its drug trafficking partners have increasingly used countries along or near the West African coast as shipment hubs for importing massive quantities of narcotics, particularly cocaine from South America, to be later distributed in Europe or elsewhere within Africa or Asia. Cocaine is transported by air and sea by South American front organizations with aircraft and ships to Africa for shipment to Europe. Hezbollah and its members and supporters partner with FARC to traffic drugs, primarily through Venezuela, but also through the border regions of Argentina, Brazil and Paraguay, to West Africa to reach markets in Europe, the Middle East and Asia. Hezbollah and its members launder FARC cocaine proceed from these operations. (Weapons and other contraband move through these same trade routes).

15. A long DEA investigation, in which I was involved as the Chief of Enforcement Operations, Global Operations, revealed the increasing relationship between FARC and Hezbollah-related entities in Africa. In or around 2009, law enforcement began to observe that

massive shipments of cocaine were heading east from South America, often through Venezuela, to West Africa. Based on a series of law enforcement reports stemming from African security forces and European law enforcement, and information derived from cooperating sources with inside knowledge of money laundering schemes, it became clear that a consortium of international drug traffickers, including FARC suppliers in Colombia, traffickers in West African nations of Benin, Ghana and traffickers in Europe, conspired and distributed multi-ton shipments of cocaine from South America, through West Africa, to Europe. Illegal proceeds from this drug trafficking enterprise were either remitted directly to Hezbollah components in Lebanon or transferred to financial institutions utilized to purchase commodities for resale in Africa.

16.  As a result of this investigation, on December 15, 2011, Preet Bharara, United States Attorney for the Southern District of New York, filed a Verified Complaint alleging a widespread, international scheme in which Lebanese financial institutions with links to Hezballah, including the now defunct Lebanese Canadian Bank, used the U.S. financial system to launder narcotics trafficking and other criminal proceeds through West Africa and back into Lebanon. *See United States v. Lebanese Canadian Bank SAL, et al.* Case No. 11-9186-CV-9186-PAE in the United States District Court for the Southern District of New York. The source documents in this case, which I was made aware of, include wire transfer records showing millions of dollars in transfers as part of a money laundering scheme involving Hezbollah members and supporters.

17.  This particular case highlights a major narco-terrorist smuggling and money laundering route in use for at least the last decade under which FARC-generated cocaine was sold and transported to West Africa. Hezbollah terrorists then delivered the product to Europe and laundered the proceeds.

18. According to the Verified Complaint in the Canadian Lebanese Bank case, in which one of my DEA colleagues provided the verification[1],

> 33. Hizballah is a Lebanon-based terrorist organization formed in approximately 1982. Hizballah is responsible for some of the deadliest terrorist attacks against the United States, including the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983 and the U.S. Embassy Annex in Beirut in 1984.
>
> 34. According to the U.S. Department of State, Hizballah receives training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid from Iran; training, weapons, diplomatic, and political support from Syria; and funding from private donations and profits from legal and illegal businesses.
>
> 35. Hizballah operates a network of social programs and political operations within Lebanon alongside its militia and terrorist operatives, and has been described as a "state within a state." As discussed above, Hizballah has been identified as a terrorist organization by the U.S. Government under numerous sanctions regulations.
>
> 36. In testimony before the Subcommittee on Near Eastern and South Central Asian Affairs of the Senate Committee on Foreign Relations in June 2010, the U.S. Department of State Coordinator for Counterterrorism described Hizballah as follows:
>
>> Hizballah's persistence as a well-armed terrorist group within Lebanon, as well as its robust relationships with Iran and Syria, and the transfer of increasingly sophisticated missiles and rockets to Hizballah, threaten the interests of the United States, Lebanon, and our partners in the region, especially Israel.
>
> * * *
>
>> Hizballah remains the most technically-capable terrorist group in the world and a continued security threat to the United States. Hizballah is responsible for some of the deadliest terrorist attacks against Americans in history, and the United States has designated it as a Foreign Terrorist Organization since 1997.

---

[1] I was made aware of the source documentation employed by the affiant preparing the Verified Complaint, and agree with it entirely.

* * *

There has been much debate over the political identity of Hizballah, as well as the prospects for Hizballah to become a legitimate political party within Lebanon. Following Lebanon's bloody civil war, other militias disbanded or were integrated into Lebanon's legitimate defense force, the Lebanese Armed Forces (LAF). However, despite the group's rhetoric and political campaigning, there remains today no meaningful distinction between the military and political wings of Hizballah, as Hizballah's own leaders regularly acknowledge publicly. . . . Hizballah is the lone militia the refused to disarm following the signing of the Taif Accord, which marked the end of Lebanon's tragic civil war.

* * *

Despite the devastating effects of its 2006 war with Israel and the 2008 domestic conflict in Lebanon, which Hizballah initiated, Hizballah remains today one of the best armed and most dangerous militias in the world. Its capabilities exceed those of the legitimate Lebanese security services and the United Nations Interim Force in Lebanon (UNIFIL). . . .

Hizballah also claims publicly to have reconstituted and improved its arsenal since the 2006 war. As Lebanon has no domestic arms industry, this would have undoubtedly been accomplished by means of smuggling activity via Syria and Iran. In 2008 alone, Iran provided hundreds of millions of dollars to Hizballah and trained thousands of Hizballah fighters at camps in Iran. Iran continues to assist Hizballah in rearming, violating Security Council resolution 1701. . . .

While Iran continues to provide a significant portion of Hizballah's funding, Hizballah has also broadened its sources of financial support in recent years. Hizballah is now heavily involved in a wide rante of criminal activity, including the drug trade and smuggling. It also receives funds from both legitimate and illicit businesses that its members operate, from NGOs under its control, and from donations from its supporters throughout the world. Hizballah also has established its own commercial and communications networks outside the Lebanese legal system that in essence rob the Lebanesse treasury of the tax revenues that would come via legitimate licensing, registration, and tax reporting.

37.     Hizballah has developed links to money laundering and narcotics trafficking. Since in or around 2006, such narcotics trafficking has been condoned through the issuance of fatwas by radical Islamic clerics. The narcotics trade has become a source of revenue for Hizballah.

C.     Narcotics Trafficking in West Africa

> 38. During the last decade, drug trafficking organizations have increasingly used countries along or near the West African coast as trans-shipment hubs for importing massive quantities of narcotics, particularly cocaine from South America, to be later distributed in Europe or elsewhere within Africa. Through a combination of privately owned aircraft and maritime vessels, these organizations, predominantly based in Venezuela and Colombia, have transported hundreds of tons of cocaine, worth billions of dollars, to West African nations such as Benin, Sierra Leone, and Togo.
>
> 39. According to a 2010 report by the U.S. Congressional Research Service, law enforcement officials seized at least 46 metric tons of cocaine bound for Europe via West Africa between 2005 and 2008. As much as 300 metric tons of cocaine, worth approximately $13.5 billion, is estimated to be trafficked through West Africa to Europe each year. The wholesale profits reaped by narco-traffickers during this period are estimated to be approximately $3.5 billion per year.
>
> 40. Narco-traffickers connected to the money laundering scheme are heavily involved in this West African narcotics trade. For example: . . .

19. The Verified Complaint goes on to provide examples of individuals and front companies who work with Hezbollah and other terrorist groups in this African connection of the FARC-dominated drug trade.

20. More specifically, the Verified Complaint provided sworn testimony that Kassim Tajedin and the companies associated with him, the very individual and entities at issue here, are closely linked to Hezbollah. It was the bank's connection to these entities (as well as others) that lead first to the finding that the bank is an institution of primary money-laundering concern, and then to the forfeiture action against it. The Verified Complaint states:

> 4. On February 10, 2011, the United States Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN") issued a finding and a proposed rule, pursuant to Section 311 of the USA PATRIOT ACT, Title 31, United States Code, 5318A, that the Lebanese Canadian Bank SAL ("LCB") is a financial institution of primary money laundering concern (the "311 Action"). . . . The 311 Action was based, inter alia, on FinCEN's determination that **there was reason to believe that LCB has been routinely used by drug traffickers and money launderers operating in various countries in Central and South**

> America, Europe, Africa, and the Middle East, including by at least one narco-trafficker who is a supporter of Hizballah and another who provides financial support to Hizballah. . . . .
>
> 44. Prior to being identified as an entity of primary money laundering concern by FinCEN in the 311 Action, LCB had poor anti-money (sic) laundering controls and, indeed, knowingly conducted business with Hizbollah-controlled entities and individuals and entities linked to, among other things, African diamond smuggling, money laundering, and narcotics trafficking. [For example]
>
> > e. LCB maintained a banking relationship with Matrix SAL Offshore, a company controlled by Kassem Mohamad Ajami and Mohamad Ali Ezzedine. Ajami and Ezzedine also owned Babylon Enterprises Nigeria Limited. Ajami and Ezzedine are **business associates of Ali Tajideen's company, Tajco. On December 9, 2012, OFAC designated Ali Tajideen, his brother Husayn Tajideen, and their company Tajco SARL – along with a network of businesses owned or controlled by them in Gambia, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands – as SDGTs pursuant to Executive Order 13224 and the Global Terrorism Sanctions Regulations. OFAC described Ali Tajideen as a former Hizbollah commander and the Tajideen brothers as Hizbollah fundraisers. Their company, Tajco was described as an international trade and real-estate company that purchased and developed properties in Lebanon on behalf of Hizbollah and that generated millions of dollars in proceeds to provide financial support to Hizbollah. Ali and Husayn Tajideens brother, Kassim Tajideen, was designated a SDGT [Specially Designated Global Terrorist] on May 27, 2009, and described by OFAC as an important financial contributor to Hizbollah who runs a network of businesses in Lebanon and Africa.**

(Emphasis added).

21. Given the overwhelming case against it as an instrument to launder funds of the FARC-dominated cocaine trade and Hezbollah terrorist network, the Lebanese Canadian Bank forfeited $102,000,000, ceased its operations, and sold its remaining assets. *See* Stipulation and Order of Settlement Regarding Lebanese Canadian Bank and Societe Generale de Banque au Liban S.A.L., DE 462 in *United States v. Lebanese Canadian Bank SAL, et al.* Case No. 11-9186-CV-9186-PAE in the United States District Court for the Southern District of New York.

22. As stated above, the Government sought forfeiture of the Lebanese Canadian Bank's assets based in part on the bank's ties to money launderers and drug traffickers tied to the

cocaine trade and tied to Hezbollah's financial network, and in particular due to ties to Kassim Tajideen and companies associated with him. These ties were the subjects of findings by the Government that lead to Kassim Tajideen's designation as an SDGT on May 27, 2009, and further designations of his associates and companies related to him on December 12, 2009. As the Department of Treasury stated in its press release on that date:

> Treasury Targets Hizballah Financial Network
>
> 12/9/2010
>
> WASHINGTON – The U.S. Department of the Treasury targeted Hizballah's financial network today by designating Hizballah fundraisers Ali Tajideen and Husayn Tajideen for providing support to Hizballah. Today's designees are the brothers and business partners of **Kassim Tajideen, an important financial contributor to Hizballah, who was designated by Treasury as a Specially Designated Global Terrorist (SDGT) in May 2009 pursuant to Executive Order (E.O.) 13224.** Today's action also targeted a network of businesses that are owned or controlled by the Tajideen brothers operating in The Gambia, Lebanon, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands. Also designated today for providing support to Hizballah was Bilal Mohsen Wehbe, a Hizballah member who has served, at the request of Hizballah Secretary General Hassan Nasrallah, as Hizballah's chief representative in South America. Today's actions were taken pursuant to E.O.13224, which targets for sanctions terrorists and those providing support to terrorists or acts of terrorism, isolating them from the U.S. financial and commercial systems.
>
> Hizballah is among the most dangerous terrorist groups in the world. The Annex to Executive Order 12947 of January 23, 1995 listed Hizballah as a Specially Designated Terrorist (SDT). The Department of State designated Hizballah as a Foreign Terrorist Organization (FTO) in 1997. Additionally, on October 31, 2001, Hizballah was designated as a SDGT under E.O. 13224. "Today's designation targets two of Hizballah's top financiers in Africa. Ali and Husayn Tajideen's multinational network generates millions of dollars in funding and secures strategic geographical strongholds for Hizballah," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey.
>
> Ali Tajideen is a former Hizballah commander in Hanouay, Tyre, Lebanon, and has provided cash to Hizballah, in tranches as large as $1 million. Ali Tajideen is a major player in Jihad Al Bina, a Lebanon-based construction company formed and operated by Hizballah, which was designated by the Treasury Department in February 2007 pursuant to E.O. 13224. Husayn Tajideen is a primary Hizballah fundraiser and prominent Hizballah supporter in The Gambia.

The following businesses in Ali Tajideen, Husayn Tajideen and Kassim Tajideen's network were designated by Treasury today:

Tajco: Tajco is a multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali, Husayn and Kassim Tajideen. As of February 2007, Kassim Tajideen owned Tajco and used proceeds from this business to provide millions of dollars in financial support to Hizballah. Husayn Tajideen, co-owner of Tajco Ltd in The Gambia, serves as the company's managing director. Ali Tajideen and Kassim Tajideen were business partners and co-owners of Tajco Sarl, operating as Tajco Company LLC in Tyre, Lebanon, with Ali Tajideen serving as the managing partner.

Since at least December 2007, Ali Tajideen used Tajco Sarl, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on behalf of Hizballah. Under the name of Tajco Company LLC, Ali Tajideen developed the properties, established mortgage loans and acquired mortgage-life insurance to cover the mortgage borrowers. Since at least March 2006, Husayn Tajideen owned 50 percent of Tajco Ltd, in Banjul, The Gambia and served as the managing director of the company.

Kairaba Supermarket: Kairaba Supermarket is a subsidiary business of Tajco Ltd, with both companies naming Husayn Tajideen as the same point of contact and manager and using the same primary business address.

Congo Futur: As of mid-2007, the Tajideen brothers were running cover companies in the food and diamond trades for Hizballah. Since then, Kassim Tajideen owned Congo Futur, which operates in the food and diamond trades.

Ovlas Trading S.A.: Kassim Tajideen owns Ovlas Trading which operates in the food manufacturing business.

Golfrate Holdings (Angola) Lda: Owned by Kassim Tajideen, Golfrate is a wholly owned subsidiary of Ovlas Trading, with part of its main operations located in Angola.

Afri Belg Commercio E Industria Lda: Afri Belg Commercio E Industria Lda, is a subsidiary of Ovlas Trading, and is presided over by Kassim Tajideen.

Grupo Arosfran Empreendimentos E Participacoes Sarl (Grupo Arosfran): Kassim Tajideen founded Grupo Arosfran in Luanda, Angola, in November 1991. He has been the primary decision maker and leader of Grupo Arosfran and a member of the Board of Directors. Grupo Arosfran is listed as either a branch or a subsidiary of Ovlas Trading on multiple international business websites.

> As Hizballah's chief representative in South America, Bilal Mohsen Wehbe has relayed information and direction between Hizballah leaders in Lebanon and Hizballah elements in South America. He has also overseen Hizballah's counterintelligence activity in the Tri-Border Area (TBA) of Argentina, Brazil and Paraguay.
>
> Wehbe has been involved in transferring funds collected in Brazil to Hizballah in Lebanon. Following Hizballah's conflict with Israel in 2006, Wehbe and Ali Muhammad Kazan, identified by Treasury as a SDGT in December 2006, raised more than $500,000 for Hizballah from Lebanese businessmen in the TBA. Wehbe also has worked for the office of Iranian Supreme Leader Ayatollah Ali Khamenei, whose regime provides the majority of Hizballah's budget.

*See* OFAC press release available at http://www.treasury.gov/press-center/press-releases/Pages/tg997.aspx.

23. I was aware of the investigation that lead to the designation of Kassim Tajideen and agree with the designation in its entirety.

24. I am aware of other examples of the connection between the FARC and Hezbollah.

25. For example the U.S. has indicted and convicted Hizbollah-related individuals for their role in the FARC-dominated drug trade. The United States indicted Ayman Joumaa on drug trafficking and money laundering charges in 2011 for trafficking cocaine from Colombia through West Africa and laundering hundreds of millions of dollars in cocaine proceeds. *See* e.g. Indictment in *United States v. Ayman Joumaa*, Case No. 11-cr-560 in the United States District Court for the Eastern District of Virginia.

26. Another Hezbollah operative was Ali Biro. Ali Biro, working with Hezbollah, trafficked FARC coca paste and drug making materials to the Beqaa Valley and supported Hezbollah with the proceeds. FARC coca paste has been traced to the Bekaa Valley in Lebanon.

27. It is undeniable that Hezbollah and its members and affiliates are heavily involved in the narcotics trade, aiding the FARC with its global cocaine distribution from Colombia.

28. The U.S. Congress has conducted numerous hearing setting forth that Hezbollah is heavily involved in the global cocaine trade. Hezbollah is involved in the cocaine trade with the FARC and exchanges lessons learned and military tactics and strategy with the FARC.

29. The U.S. House of Representatives Majority Report entitled, "A Line in the Sand: Countering Crime, Violence and Terror at the Southwest Border," made the following observation:

> Now we are faced with a new threat in Latin America that comes from the growing collaborations between Iran, Venezuela, Hezbollah and transnational criminal organizations.

U.S. House Committee on Homeland Security, Nov. 2012, http://homeland.house.gov/sites/homeland.house.gov/files/11-15-12-Line-in-the-Sand.pdf. The transnational criminal organizations include, of course, the FARC. They are all working together.

30. In sum, I was involved in investigations by the DEA, which began in 2009, focusing on major drug trafficking activities connecting FARC cocaine suppliers to drug trafficking organizations located in West African countries in consortium with European narco cells. With illegal drug proceeds shipped from Europe to Hezbollah, the Hezbollah connected operators in the United States would purchase commodities for export to Africa and sold in a money laundering scheme that provided Hezbollah revenue to support their operations in Lebanon. These investigations implicated Kassim Tajeddin and companies associated with him.

31. Based on the preceding, it is my opinion that the the OFAC-designated individual and entities listed below are all agencies or instrumentalities of the FARC:

- Goldfrate Holdings (Angola) LDA (or any subsidiary thereof) – SDGT

- TAJCO a/k/a TAJCO LTD. a/k/a TAJCO SARL a/k/a TAJCO COMPANY a/ka TAJCO COMPANY LLC a/k/a TRADEX CO, (or any alias thereof) a/k/a Grand Stores (or any alias thereof) – SDGT
- Kassim Tajeddine a/ka Kassim Mohhamad Tajiddine a/k/a Qasim Taji Al-din a/k/a Kasim Taji Al-din a/k/a Kasim Tajmudin – SDGT
- Grupo Arposfran Empre Particacoes a/k/a Grupo Arofran a/k/a Grupo Arosfran Empreendimentos E Participacoes Sarl a/k/a Arosfran – SDGT
- Grand Stores Ltd. – SDGT
- Ovlas Trading, S.A. – SDGT

PURSUANT TO 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Belmont, N.C. this 7 day of August, 2015.

David L. Gaddis